O

# United States District Court
# Central District of California

| | |
|---|---|
| OLGA CURTIS, | Case № 2:14-cv-00591-ODW(SSx) |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART** |
| SHINSACHI PHARMACEUTICAL INC.; | **PLAINTIFF'S MOTION FOR** |
| SEUNGWOO SHIN; DOES 1–10, | **DEFAULT JUDGMENT [24]** |
| inclusive, | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Olga Curtis and Defendants ShinSachi Pharmaceutical Inc. and Seungwoo Shin are competitors in the rather niche tattoo-numbing-cream market. Curtis has purchased products for resale from Defendants in the past and also sold her own products under the names TATTOONUMB, SUPERNUMB, AND DEEPNUMB.

But after Curtis started using those marks, Defendants registered them with the United States Patent and Trademark Office and then sent Curtis's service providers takedown notices alleging copyright and trademark infringement.  Curtis brought this action to determine her superior rights to the NUMB marks, cancel Defendants' trademark registrations, and adjudicate the takedown notices and Defendants'

interference with her service-provider contracts.  Defendants failed to respond, and the Court entered default.  For the reasons discussed below, the Court **GRANTS IN PART** Curtis's Application for Default Judgment.[1]  (ECF No. 24.)

## II.   FACTUAL BACKGROUND

Curtis has her principal place of business in Moscow, Idaho.  (FAC ¶ 1.) ShinSachi is a Canadian corporation with its principal place of business in Vancouver, British Columbia, Canada.  (*Id.* ¶ 2.)  Seungwoo Shin is a Vancouver resident. (*Id.* ¶ 3.)

### 1.   Curtis's NUMB Marks

Curtis first used the term TATTOONUMB on June 25, 2011, SUPERNUMB on June 12, 2011, and DEEPNUMB on June 16, 2011.  (*Id.* ¶ 10; Curtis Decl. Ex. C.)  On February 15, 2014, she obtained a federal trademark registration for NUMBFAST® from the United States Patent and Trademark Office.  (FAC ¶ 12.)  She has continued to use these marks (collectively, the "NUMB Marks") since their first-use dates.  (*Id.* ¶ 13.)

Curtis primarily sells her topical anesthetics bearing the NUMB Marks on the Internet through eBay listings.  (*Id.* ¶ 15.)  She also promotes and sells her skin creams bearing the NUMB Marks via her website located at www.numbcreams.com.  (*Id.* ¶ 16.)

### 2.   Defendants' marks

Defendants produce a competing topical anesthetic under the trademark DR. NUMB.  (*Id.* ¶ 18.)  Shin, a ShinSachi director, registered the DR. NUMB trademark with the USPTO.  (*Id.* ¶ 19.)  Curtis has purchased DR. NUMB products directly from Defendants and then resold them through her website www.numbcreams.com.  (*Id.* ¶ 21.)  Defendants did not retain ownership of the DR. NUMB creams they sold to Curtis.  (*Id.* ¶ 23.)

---

[1] After carefully considering the papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; L.R. 7-15.

On February 16, 2012, ShinSachi filed three federal trademark applications with the USPTO for TATTOONUMB, SUPERNUMB, and DEEPNUMB.  (*Id.* ¶ 25.)  ShinSachi listed the first-use dates for each alleged mark as August 11, 2011.  (*Id.*)  In February and April 2013, the USPTO issued trademark registrations for each of these marks.  (*Id.* ¶¶ 26–28.)

### 3.  *Defendants' takedown notices*

Between 2011 and 2013, Defendants submitted 30 Notices of Claimed Infringement via eBay's Verified Rights Owner Program, alleging that Curtis had committed copyright and trademark infringement via her various eBay listings.  (*Id.* ¶ 36.)  Curtis alleges that these listings either involved her own NUMB marks or products bearing Defendants' DR. NUMB mark that she purchased from them.  (*Id.* ¶ 39.)  These listings did not include any of Defendants' copyrighted text or graphics.  (*Id.* ¶ 40.)  In total, eBay removed at least 140 of Curtis's listings.  (*Id.* ¶ 47.)  eBay also issued "strikes" against her selling account, resulting in less desirable listing placement.  (*Id.* ¶ 49; Curtis Decl. Ex. A.)

eBay notified Curtis of each instance of alleged infringement and then removed her listings.  (FAC ¶ 42.)  After Curtis contacted Defendants to inquire about the takedown notices, they informed her that they believed she had engaged in copyright infringement.  (*Id.* ¶ 43.)

Curtis submitted several takedown counter-notices to eBay.  (*Id.* ¶ 44.)  When Defendants did not file an action challenging the counter-notices, eBay restored some listings.  (*Id.* ¶ 45.)

In November 2012, Defendants sent a complaint to Google's AdWords program alleging that Curtis was selling counterfeit goods.  (*Id.* ¶ 50; Curtis Decl. Ex. A.)  As a result, Google terminated Curtis's account, and she is still unable to advertise via AdWords.  (FAC ¶ 50.)

In 2013, Defendants submitted two complaints to Serversea, the company that hosts Curtis's website.  (*Id.* ¶¶ 51–52.)  Defendants complained of copyright and

trademark infringement and that Curtis had engaged in "spamming." (*Id.* ¶ 51.) Serversea took down Curtis's website twice and requested that she explain her actions. (*Id.* ¶¶ 51–52; Curtis Decl. Ex. A.)

### 4. Defendants' websites

Defendants also registered the domain names www.numbfast.com, www.supernumb.com, and www.deepnumb.com. (FAC ¶¶ 54–57.) On www.numbfast.com, Defendants write, "Numbfast is no longer available[]" and "Numbfast is now discontinued! If you need a health-certified numbing cream, use Dr. Numb!" (Curtis Decl. Ex. B.) On www.deepnumb.com and www.supernumb.com, Defendants state that DeepNumb and SuperNumb are "under an FDA recall" and subject to an injunction. (*Id.*) Curtis alleges that these products are not in fact under an FDA recall or subject to an injunction. (FAC ¶ 57.)

### 5. Curtis files suit

On January 24, 2014, Curtis filed this action against Defendants. (ECF No. 1.) She subsequently amended her complaint, alleging declaratory and injunctive relief; copyright-infringement misrepresentations under 17 U.S.C. § 512(f); federal-trademark cancellation; federal cyberpiracy under 15 U.S.C. § 1125(d); trade libel; intentional interference with contract; and intentional interference with prospective economic advantage. (ECF No. 7.)

After Curtis served Defendants in Vancouver (ECF Nos. 13, 14), Defendants failed to answer or otherwise respond. This Court subsequently entered default, and Curtis moved entry of default judgment. (ECF No. 24.) That Application is now before the Court for decision.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk enters default under Rule 55(a). Local Rule 55-1 requires that the movant submit a declaration establishing (1) when and against which party default was entered; (2) identification of the pleading to which default was entered;

(3) whether the defaulting party is a minor, incompetent person, or active service member; and (4) that the defaulting party was properly served with notice.

A district court has discretion whether to enter default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Upon default, the defendant's liability generally is conclusively established, and the well-pleaded factual allegations in the complaint are accepted as true. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–19 (9th Cir. 1987) (per curiam) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).

In exercising its discretion, a court must consider several factors, including (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether the defendant's default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

## IV.   DISCUSSION

The Court finds that Shin and ShinSachi received proper notice of this action, are subject to specific personal jurisdiction in California, and are liable on all of Curtis's claims except for trade libel.

### A.   Notice

On April 29, 2014, and May 15, 2014, Curtis served Shin and ShinSachi, respectively, in British Columbia, Canada. (ECF Nos. 13, 14.) On June 12, 2014, Curtis requested that the Clerk of Court enter default against Defendants. (ECF No. 16.) Since the Clerk is not authorized to enter default when foreign service is involved, the Clerk referred the Application to this Court. (ECF No. 19.) The Court subsequently authorized the Clerk to enter default against Shin and ShinSachi, finding that Curtis properly served Defendants under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents and Canadian law. (ECF No. 21.)

Since this Court has already extensively analyzed whether Curtis provided Defendants with proper notice of this action, the Court need not revisit that issue here.

**B.      Personal jurisdiction**

Shin and ShinSachi are both foreign defendants not physically present in the United States—let alone California.  The Court must accordingly determine whether it may properly exercise personal jurisdiction over them.

District courts have the power to exercise personal jurisdiction to the extent of the law of the state in which they sit.  Fed. R. Civ. P. 4(k)(1)(A); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1988).  California's long-arm jurisdictional statute is coextensive with federal due-process requirements.  Cal. Civ. Proc. Code § 410.10; *Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991).  Thus, a defendant must "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

In tort-based suits like this case, courts must employ the purposeful-direction analysis.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  Under this analysis—that is, the *Calder* effects test—the defendant must have (1) committed an intentional act; (2) expressly aimed the act at the forum state; and (3) caused harm that the defendant knew was likely to be suffered in the forum state.  *Id.* (citing *Calder v. Jones*, 465 U.S. 783 (1984)).  The first element requires an "intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result of consequence of that action."  *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2012).  To have expressly aimed conduct at the forum state, the defendant must have engaged in wrongful conduct targeting a plaintiff who the defendant knows to reside in the forum state.  *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th. Cir. 2000).  Finally, Curtis must demonstrate that the individual defendants "caused harm that [they] knew was likely

1   to be suffered in the forum." *Brayton Purcell*, 606 F.3d at 1131.  This element may be
2   satisfied even if "the bulk of the harm" occurred outside the state.  *Yahoo! Inc. v. La*
3   *Ligue Contre Le Racisme*, 433 F.3d 1199, 1207 (9th Cir. 2006).

4       Curtis alleges that Defendants are subject to personal jurisdiction in California
5   because they conduct business in California by operating interactive websites
6   purposefully directed at California residents, selling skin creams to California
7   residents, and using the Internet to send electronic communications containing false
8   statements to Curtis's third-party service providers in California, including eBay,
9   Google, and PayPal.  (FAC ¶ 7.)

10      The Ninth Circuit has not adopted a brightline rule that maintaining a website
11  directed at forum residents suffices to satisfy the expressly aimed prong.  *See Mavrix*
12  *Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011); *DFSB*
13  *Kollective Co. Ltd. v. Bourne*, 897 F. Supp. 2d 871, 883 (N.D. Cal. 2012).  But the
14  court has held that "operating even a passive website in conjunction with 'something
15  more'—conduct directly targeting the forum—is sufficient."  *Marvix*, 647 F.3d at
16  1229.  That "something more" may include an interactive website, the "geographic
17  scope of the defendant's commercial ambitions," and "whether the defendant
18  individually targeted a plaintiff known to be a forum resident."  *Id.*

19      The screen shots of Defendants' websites do not establish that they are
20  interactive.  They consist merely of text and links to other pages and websites.  There
21  is no ability for visitors to become involved with the content, such as by leaving
22  comments, actively communicating with Defendants, requesting information, or
23  otherwise doing more than merely passively reading.  Neither is Curtis a California
24  resident; rather, she is a resident of Idaho.  (FAC ¶ 1.)  Defendants' ownership and
25  maintenance of the websites alone is not sufficient to establish that they expressly
26  aimed their conduct at California.

27      But Curtis has alleged that Defendants sold tattoo creams bearing the marks in
28  question in California and sent the allegedly false takedown notices to California

1   companies, thereby creating the brunt of her lost sales.  The Court must accept as true

2   Curtis's allegation that Defendants directed their conduct at California residents,

3   which thus satisfies the expressly aimed prong.  It is not clear where Curtis suffered

4   all of the harm from Defendants' conduct, but she has at least alleged that she suffered

5   some harm in California.  Most notably, California-based companies such as Google

6   and eBay either terminated her business accounts or negatively impacted her ability to

7   advertise and sell online.

8   The Court therefore finds that Shin and ShinSachi are subject to specific

9   jurisdiction in California.

10  **C.   Liability**

11  The Court finds that Curtis adequately pleaded all necessary elements of her

12  claims except for trade libel, as Curtis has withdrawn that claim.

13  *1.   Misrepresentation in DMCA takedown notices*

14  Curtis first moves for default judgment on her claim for misrepresentation in

15  "takedown notices" sent to eBay, Google, and Serversea.  The Digital Millennium

16  Copyright Act ("DMCA") added a provision dealing with how an Internet service

17  provider should deal with a copyright holder alleging that a user infringed its

18  intellectual property.  Congress resolved this issue by establishing a takedown-notice

19  scheme under which a service provider is not subject to liability if it complies with 17

20  U.S.C. § 512.   A copyright holder must comply with various requirements when

21  sending its notification of claimed infringement to the service provider.

22  § 512(c)(3)(A).  One such requirement establishes that the complaining party must

23  have "a good faith belief that use of the material in the manner complained of is not

24  authorized by the copyright owner, its agent, or the law." § 512(c)(3)(A)(v).

25  Congress also provided a remedial scheme for users who are subject to abusive

26  takedown notices.   Under § 512(f), "[a]ny person who knowingly materially

27  misrepresents under this section . . . (1) that material or activity is infringing, or

28  (2) that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer." To be liable under this subsection, the copyright owner must have "actual knowledge of the misrepresentation." *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004).

Curtis alleges that Defendants submitted DMCA takedown notices to eBay, Google, Google, PayPal, and Serversea complaining of "copyright infringement of images and/or text owned by Defendants, without specifying any copyright registration, and without identifying the images or text allegedly used by Plaintiff." (FAC ¶ 34.) She further contends that the accused eBay listings "did not include any of Defendants' copyrighted text or graphics." (*Id.* ¶ 40.) Without Curtis having used any of Defendants' protected material, she cannot be liable for copyright infringement, as there is no "work" at issue to infringe. *See* § 102(a). Moreover, while § 512(f) requires actual knowledge of the infringement misrepresentation, that requirement is a state of mind that Curtis properly averred generally. *See* Fed. R. Civ. P. 9(b) (providing that knowledge "may be alleged generally"). Since Curtis repeatedly alleged that Defendants knew that the takedown notices contained false infringement allegations, she adequately pleaded all of § 512(f)'s elements.

### 2. *Trademark cancellation*

Curtis next requests that the Court invoke its power under the Lanham Act to cancel Defendants' trademarks for TATTOONUMB, SUPERNUMB, and DEEPNUMB, as she alleges that she used the marks prior to Defendants' listed first-use date.

The Lanham Act provides that the "owner of a trademark used in commerce" may request that the USPTO register them. 15 U.S.C. § 1051(a)(1). The Act also sets forth several other requirements, including what the registrant must include on the application. § 1051(a).

/ / /

Once the USPTO registers a trademark, the registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." § 1057(b); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999). But the Act also empowers courts to, among other things, "determine the right to registration" and "order the cancelation of registrations . . . with respect to any party to the action." 15 U.S.C. § 1119.

Priority of use is one ground for invalidation. *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219–20 (9th Cir. 1996). "It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.* at 1219. The party claiming to be a senior user must establish by a preponderance of the evidence that she used the mark in commerce first. *Id.* "[I]f the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated." *Id.* at 1220.

Curtis has adduced evidence establishing that she used the marks "DEEP NUMB," "SUPER NUMB," and "TattooNumb" in commerce as of June 17, 2011; June 12, 2011; and July 22, 2011; respectively. (Curtis Decl. Ex. C.) But ShinSachi included on its trademark registration for DEEPNUMB a first-use date of August 11, 2011, and a first-use-in-commerce date of February 12, 2012. (*Id.*) For "SUPERNUMB," ShinSachi listed the first-use date as August 12, 2011, and February 5, 2012, as the day first used in commerce. (*Id.*) Lastly, ShinSachi's TATTOONUMB registration reflects a first-use date of August 12, 2011, and a first-use-in-commerce date of February 3, 2012. (*Id.*)

Going by the dates themselves, Curtis has established that she used her marks in commerce prior to ShinSachi. While the marks are not identical—two include spaces

between the words and one uses a combination of upper- and lower-case letters—the marks are similar enough that "a 'reasonably prudent consumer' in the marketplace [would] likely . . . be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998); *see also M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (listing "similarity of the marks" as one of the trademark-infringement factors expounded by the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), *abrogated on other grounds as recognized in Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)).  This is especially true because both Curtis and ShinSachi only claim the words themselves as a mark and do not rely on particular colors, fonts, or other design elements that would need to be similar.

The Court therefore finds that based on Curtis's allegations, she is a senior user of the DEEPNUMB, SUPERNUMB, and TATTOONUMB marks and that ShinSachi was accordingly not entitled to register those marks with the USPTO.

   3.   *Federal cyberpiracy*

Curtis additionally brings a claim under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 17 U.S.C. § 1125(d), based on Defendants' registration of the www.numbfast.com, www.supernumb.com, and www.deepnumb.com domain names.

The ACPA establishes civil liability for "cyberpiracy" "where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010); *see also* 17 U.S.C. § 1125(d)(1)(A).  Congress listed several factors a court may consider in determining whether a defendant has acted with bad faith, including "the trademark or other intellectual property rights of the person, if any, in the domain name," "the person's

intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site," and "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names." § 1125(d)(1)(B)(i)(I), (V), (VIII).

Curtis has established via the Internet Corporation for Assigned Names and Numbers's WHOIS database that ShinSachi registered the domain names supernumb.com and deepnumb.com. (De Almeida Decl. Ex. A.) But numbfast.com was registered by Domains By Proxy, LLC, which appears to be GoDaddy.com's domain privacy service. (*Id.*) While the WHOIS information does not tie numbfast.com to either Shin or ShinSachi, the Court must accept as true Curtis's allegation that Defendants registered numbfast.com through this proxy service.

The domain names are also identical or at least confusingly similar to Plaintiff's registered and common-law marks. Numbfast.com is identical to Curtis's federal trademark for NUMBFAST. Deepnumb.com and supernumb.com are also nearly identical to Curtis's common-law marks for DEEP NUMB and SUPER NUMB.

Moreover, Defendants blatantly acted with bad faith in registering these three domain names. They published false information, misinforming the public that Curtis's NUMBFAST product "is no longer available" and "discontinued." (Curtis Decl. Ex. B.) They also wrote that SUPERNUMB and DEEPNUMB are "under an FDA recall" and subject to an injunction. (*Id.*) All of this information is untrue. To make matters worse, each accused website then directs visitors to www.DrNumb.com—which belongs to Defendants—thereby diverting business from Curtis.

/ / /

The Court thus finds that Defendants violated the ACPA by registering the domain names www.numbfast.com, www.supernumb.com, and www.deepnumb.com.

### 4.    Trade libel

Curtis's trade-libel and intentional-interference claims are creatures of state law.  Since Curtis is an Idaho citizen and she has brought her claims in California, the Court must perform a conflict-of-laws analysis between the two states.  Federal courts must apply the forum state's choice-of-law rules when dealing with common-law claims over which they have supplemental jurisdiction.  *See Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983).

California courts employ a three-style choice-of-law rubric under the governmental-interest approach.  *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 919–20 (2001).  First, the foreign-law proponent "must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California."  *Id.* at 919.  If the laws are materially different, the court must then determine whether each state has an interest in having its law apply.  *Id.* at 920.  Finally, if both states have an interest, then the court must determine which state's interest would be "more impaired" by applying the other state's law.  *Id.*

On August 28, 2014, the Court issued an Order to Show Cause to Curtis, noting that it did not appear that Idaho recognized a tort for trade libel.  In fact, the Court was unable to find a single Idaho case even mentioning the phrase.  In response to the Order, Curtis "unequivocally waive[d] the right to any relief pursuant to their [*sic*] trade libel claim."  (ECF No. 32, at 3 (emphasis omitted).)  The Court therefore **DENIES** Curtis's Application on this ground **AS MOOT**.

### 5.    Intentional-interference claims

Since Curtis has not waived her intentional-interference claims, the Court must determine which state's law applies to them.  As Curtis pointed out in her Order to Show Cause Response, there are no material differences between Idaho and California law with respect to either intentional interference with contract or intentional

interference with prospective economic advantage.  Indeed, the torts' elements are virtually identical in both states.  *Compare Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) (listing elements for contractual interference under California law); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521–22 (Ct. App. 1996) (interference with prospective economic advantage under California law), *with Barlow v. Int'l Harvester Co.*, 522 P.2d 1102, 1114 (Idaho 1974) (Idaho's intentional-interference elements); *Commerce v. Jefferson Enters., LLC*, 303 P.3d 183, 191 (Idaho 2013) (interference with prospective economic advantage under Idaho law).  The Court therefore must apply California law.  *Wash. Mut. Bank*, 24 Cal. 4th at 920.

Under California law, a plaintiff must establish five elements to prevail on an intentional-interference-with-contract claim: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  The elements for intentional interference with prospective economic advantage are essentially the same, just substituting an economic relationship with a contract.  *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 521–22.  But in the latter type of claim, the interference must be "independently wrongful," that is, it must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008).

Curtis has properly alleged all of the elements for both claims.  She indicates that she had valid contracts with Google and eBay to market and sell her skin creams and that Defendants knew about these contracts.  She contends that Defendants intentionally submitted false takedown notices to Google and eBay, thereby causing those service providers to terminate Curtis's contracts with them.  Since she was

1   unable to sell her products through these terminated contracts, Curtis consequently

2   suffered damages.  Moreover, she had an interest in continuing to work with Google

3   and eBay in the future, which Defendants impeded through their intentional conduct.

4   Finally, those false takedown notices were independently unlawful because the

5   DMCA proscribes them.  Curtis has thus adequately pleaded all necessary elements of

6   her intentional-interference claims.

7         *6.*    *Declaration of noninfringement*

8         Lastly, Curtis seeks a declaration that she has not infringed Defendants'

9   DR. NUMB marks by reselling the DR. NUMB products that she purchased from

10  them.  She contends that under the first-sale doctrine, Defendants no longer had any

11  trademark rights in the products she lawfully purchased and then resold.

12        Since 1924, United States trademark law has recognized the first-sale doctrine.

13  *See Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924).  Under this doctrine, "the right of

14  a producer to control distribution of its trademarked product does not extend beyond

15  the first sale of the product.  Resale by the first purchaser of the original article under

16  the producer's trademark is neither trademark infringement nor unfair competition."

17  *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995).

18        To the extent that Curtis lawfully purchased Defendants' DR. NUMB skin-

19  cream products and then resold them, the first-sale doctrine insulates her from

20  trademark-infringement liability.  Since she alleged that the parties did not have any

21  agreement to the contrary, once Defendants sold the DR. NUMB products to Curtis,

22  they lost the ability to control her resale of them.  She is therefore not liable for

23  trademark infringement arising out of her resale as Defendants have apparently

24  alleged in their takedown notices.

25  **D.   Damages**

26        Curtis seeks several different types of relief, including statutory damages,

27  domain-ownership transfer, trademark cancellation, an injunction, declaratory

28  / / /

1    judgment, attorneys' fees, and costs.  The Court finds that all except for an injunction
2    are appropriate.

3        *1.    Statutory damages*

4        Under 15 U.S.C. § 1117(c), a court may award statutory damages between
5    $1,000 and $200,000 per counterfeit mark per type of goods or services sold or
6    offered for sale in the case of trademark infringement.  Statutory damages serve a
7    generally different purpose than actual damages—that is, they serve to punish and
8    deter infringement.  *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011
9    (9th Cir. 1994).  In determining what amount of statutory damages to award, the Ninth
10   Circuit has repeatedly expressed this deterrence policy, emphasizing that the damages
11   award should make "deliberate acts of trade-mark infringement unprofitable."  *Maier*
12   *Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968); *see*
13   *also Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993);
14   *Playboy Enters., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1275 (9th Cir.
15   1982).

16       Curtis seeks statutory damages of $100,000 per website for violation of the
17   ACPA for a total of $300,000.  She contends that the request reflects Defendants'
18   attempt to deceive her by registering the numbfast.com domain name through a proxy
19   service and Defendants' bad faith in registering the three domain names reflecting her
20   common-law and registered marks.

21       A default-judgment situation like this one places both the plaintiff and the Court
22   in the unenviable position of having to assign a value to a defendant's wrongful
23   conduct without the aid of any discovery establishing the extent and full effects of that
24   conduct.  But Congress has implicitly recognized that dilemma by empowering the
25   Court to award damages unconnected with actual harm.  The Court must therefore fall
26   back on the Ninth Circuit's punitive and deterrence policies undergirding a statutory-
27   damages award.

28   / / /

Shin and ShinSachi's conduct smacks of bad faith.  They registered marks previously used in commerce by Curtis likely to thwart Curtis's lawful efforts to sell her tattoo numbing creams—thereby injuring Curtis's business and general robust and friendly competition.  But they didn't stop there.  They proceeded to register three domain names—one of which included Plaintiff's registered trademark—and post false and disparaging information about Curtis's products on those pages.  No one knows the full extent of the harm emanating from Defendants' conduct.  But bad faith bleeds from each of Defendants' actions.

At the same time, the Court must recognize that Congress set $200,000 as the maximum statutory-damages award absent entering into willful territory.[2]  But since Curtis's $100,000-per-website request is only half of the statutory maximum for non-willful infringement, the Court finds that her requested amount is appropriately tailored to the particular circumstances known about Defendants' conduct.  The Court accordingly awards Curtis a total of $300,000.00 in statutory damages for Defendants' ACPA violations.

## 2.    Domain-ownership transfer

Curtis additionally asks the Court to order Defendants to forfeit their www.numbfast.com, www.supernumb.com, and www.deepnumb.com domain names and transfer them to her.  The ACPA provides that in "any civil action involving the registration, trafficking, or use of a domain name under [the ACPA], a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."  15 U.S.C. § 1125(d)(1)(C).

The Court has already found that Defendants violated the ACPA by registering www.numbfast.com, www.supernumb.com, and www.deepnumb.com.  Since they do not own valid marks represented by those domain names, there is no lawful reason why they could continue to own them.  Their past actions indicate that they would

---

[2] Curtis has not requested an enhanced statutory-damages award for willful conduct.  *See* 15 U.S.C. § 1117(c)(2).

likely continue to engage in bad-faith, disparaging conduct.  The Court therefore will order that Defendants forfeit those domain names and transfer ownership of them to Curtis.  But the Court declines to issue the Order directly to the domain-name registrars, as the registrars are not currently subject to the Court's jurisdiction.  That said, the registrars, along with Defendants and those acting in concert with them, may not take any actions to impede or otherwise interfere with the domain-ownership transfer.

### 3.    Trademark cancellation

The Lanham Act empowers federal courts to cancel trademark registrations.  15 U.S.C. § 1119.  Since the Court found above that Defendants are not entitled to registration of the TATTOONUMB, SUPERNUMB, and DEEPNUMB marks due to Curtis's senior use, the Court finds it appropriate to cancel the marks, Registration Numbers 4290428, 4321983, and 4326072, respectively.

### 4.    Injunction

The Lanham Act also permits a court to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable" to prevent further trademark infringement.  15 U.S.C. § 1116(a); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 502 (C.D. Cal. 2003); *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1178 (C.D. Cal. 2002).  For a court to issue a permanent injunction, a plaintiff must demonstrate "(1) actual success on the merits; (2) a likelihood of irreparable injury if injunctive relief is not granted; (3) a balance of hardships favoring Plaintiff; and (4) that an injunction will advance the public interest."  *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012) (granting a permanent injunction in a trademark-infringement action).

Curtis requests that the Court issue an injunction prohibiting Defendants from sending any other DMCA takedown notices containing infringement allegations or other wrongdoing to Curtis's third-party service providers or vendors.  She contends that she has suffered irreparable harm resulting from lost customers, profits, and

1    goodwill.   She also asserts that there is no adequate legal remedy to address
2    Defendants' false-infringement claims.   Curtis further argues that the balance of
3    hardship weighs in her favor, as false takedown notices result in eBay automatically
4    removing listings.  Finally, she contends that the public interest supports an injunction
5    since the false notices have hampered Curtis's ability to sell her products.

6          The Court finds that a permanent injunction is not appropriate in this case for
7    several reasons.  The Court is mindful of the Ninth Circuit's position that "[i]njunctive
8    relief is the remedy of choice for trademark and unfair competition cases, since there
9    is no adequate remedy at law for the injury caused by a defendant's continuing
10   infringement."  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th
11   Cir. 1988).  But this case is somewhat different from a standard infringement case, as
12   Defendants essentially hijacked Plaintiff's common-law trademarks but did not use
13   them in commerce.   Rather, they registered domain names under those marks and
14   posted disparaging information about Curtis's products and sent false takedown
15   notices to her service providers.   As established above, the Court has employed
16   several remedies to reverse Defendants' conduct and to prevent future recurrences,
17   including cancelling their trademark registrations, punishing them with hefty statutory
18   damages, and ordering the transfer of their infringing domain names.  The availability
19   of those remedies belies the notion that there is no adequate remedy at law to cure
20   Defendants' conduct.

21         The Court is also mindful of the extrajudicial procedure Congress carefully
22   crafted to deal with takedown notices.   While a service provider must "respond[]
23   expeditiously to remove, or disable access to, the material that is claimed to be
24   infringing or to be the subject of infringing activity" upon receiving a DMCA
25   takedown notice, 17 U.S.C. § 512(c)(1)(C), the accused infringer has the ability to
26   require the service provider to restore the information by sending a counter-notice,
27   § 512(g)(3).  Once the accused infringer complies with the counter-notice provisions,
28   / / /

the service provider must restore the information within 14 days after receiving the notice.  § 512(g)(2)(C).

So if Defendants continue to send false takedown notices, Curtis can mitigate lost business by submitting counter-notices.  If she believes that any future takedown notices include materially false information, she can file another action and request statutory damages—an adequate, though understandably not perfect, remedy at law.

The Court also notes that Defendants are located outside the United States and therefore outside the reach of this Court's jurisdiction.  Supervising and enforcing a permanent injunction against them for essentially eternity would be an exercise in futility.  *See Natural Res. Def. Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief may be inappropriate where it requires constant supervision.").  The justice system certainly does not win when a foreign defendant is able to evade liability, but the long arm of the law can only reach so far.

The Court consequently **DENIES** Curtis's request for a permanent injunction preventing Defendants from filing future false takedown notices.

*5. Declaratory judgment*

In her proposed judgment, Curtis requests the Court to issue the following language with respect her noninfringement declaration:

6. The Court hereby declares that:

A. Plaintiff's purchase and resale of TATTOONUMB, SUPERNUMB, DEEPNUMB, and DR NUMB skin care products in the United States is lawful under the first sale doctrine and does not infringe Defendants' copyright, trademark, or other rights;

B. the continued sale of Ms. Curtis's products is lawful and does not infringe Defendants' rights; and

C. Plaintiff has not engaged in "spamming" or selling illegal products.

(ECF No. 27.)

/ / /

The Court takes no issue with part A.  But the phrase "Ms. Curtis's products" in part B is ambiguous and would encompass products Curtis acquired from sources other than Defendants.  The Court thus modified part B to read "the continued sale of Defendants' products by Curtis is lawful and does not infringe Defendants' rights."

Finally, the Court declines to issue part C of the proposed order, as it is too broad and does not accurately reflect any issues adjudicated in this Order.

6.    *Attorneys' fees*

Curtis seeks attorneys' fees under the Lanham Act.  The Act provides that the "court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  The Ninth Circuit has explained that "generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful."  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993).  Willful infringement means that the defendant acted with a "deliberate intent to deceive."  *Id.* at 1406.

The Court has no problem finding that Defendants intentionally tried to deceive the public into believing that they owned the NUMBFAST, SUPERNUMB, and DEEPNUMB marks and that the products bearing those marks were no longer available.  The fact that the parties in this action are known competitors of each other also suggests that Defendants acted maliciously, intending to harm Curtis's business in order to benefit theirs.

Curtis requests $9,600 in attorneys' fees based on the attorneys'-fees default-judgment schedule set forth in Local Rule 55-3.  The Court agrees with that calculation and accordingly awards $9,600.00 in attorneys' fees.

7.    *Costs and interest*

As the prevailing party, Curtis is also entitled to costs as set forth in 29 U.S.C. § 1920, Federal Rule of Civil Procedure 54(d)(1) and Local Rule 54-2.  The Court accepts counsel's declaration regarding costs and accordingly awards $978.00 in costs
/ / /

to Curtis.  Curtis is also entitled to postjudgment interest under 28 U.S.C. § 1961 beginning on the date of judgment and calculated as provided in that section.

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** Curtis's Application for Default Judgment.  (ECF No. 24.)  A default judgment will issue.

**IT IS SO ORDERED.**


September 9, 2014

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**